329 A.2d 286
**COMMONWEALTH of Pennsylvania**
v.
**Daryl ROANE, Appellant.**

Supreme Court of Pennsylvania.
Argued April 21, 1972.
Reargued Jan. 18, 1974.
Decided Nov. 20, 1974.

390

Richard H. Knox, Ira I. Pechter, Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., James D. Crawford, Deputy Dist.

Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., B. H. Levintow, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

O'BRIEN, Justice.

On February 28, 1969, Eugene Sole was shot and killed during the course of a robbery of his tailor shop on North Broad Street in Philadelphia. Three youths, one readily identified by a bystander as Norman Lyons, were seen fleeing the scene of the crime, which occurred at approximately 2:50 p. m. In the course of their investigation that afternoon, the police talked to many young men in the neighborhood, including appellant, Daryl Roane, but all were released without being arrested. That evening, Norman Lyons was arrested and he made a statement to the police in which he admitted his involvement in the robbery and named appellant as the man who had pulled the trigger. The police thereupon went to the home where appellant, who was then sixteen years old,[1] lived with his mother, Mrs. Roane. At approximately 10:40 p. m., they informed appellant and Mrs. Roane that appellant was under arrest and took him to the police station at 22nd and Hunting Park Avenue in Philadelphia. Before they left the Roane home, Mrs. Roane told the police that she would be following them to the station. However, when Mrs. Roane arrived at the police station, at approximately 11:00 p. m., Daryl and the arresting officers were nowhere to be seen. Mrs. Roane waited for over an hour, during which time she was given no information concerning the whereabouts of her son. At approximately 12:10 a. m., Mrs. Roane happened to notice her son, accompanied by a detective, proceeding

1. Daryl Roane was born February 8, 1953.

to a water fountain in the hallway where Mrs. Roane had been sitting. Mrs. Roane attempted to talk with Daryl, but the opportunity was denied to her when the detective took appellant away to another interrogation room. Mrs. Roane inquired of the detective but received no answer. Since she had no idea where her son had been taken, she continued to wait. After another wait, for a period which Mrs. Roane estimated to have been approximately an hour, Mrs. Roane again saw the police taking her son across the hallway into another interrogation room. This time the door was left ajar, so Mrs. Roane, uninvited, entered. She asked the police for an opportunity to talk with Daryl to find out what had happened since his arrest. The police gave her permission, but urged her to speak up so that they could hear what she said. According to Mrs. Roane, however, her son was uncommunicative. Soon after, a police officer brought a typewriter into the room, and a detective began reading appellant his constitutional rights. When he came to appellant's right to have an attorney present before any statement was made, Mrs. Roane told the police that she wanted to obtain a lawyer for her son and she did not want any statement taken. Mrs. Roane's request was ignored, and the police began taking appellant's formal statement. When Mrs. Roane protested, one of the detectives in the room told her, "Let him talk, maybe it will make him feel better."

It was during the taking of the formal statement that Mrs. Roane learned for the first time that Daryl had already orally confessed his involvement in the killing immediately after being told that Norman Lyons had implicated him.

The formal typewritten statement was concluded at approximately 5:55 a. m. Daryl signed the statement but his mother and sister (who had arrived in the middle of the interrogation) refused to sign because, as Mrs.

Roane explained, they didn't "want him to make the statement."

The principal question presented in this appeal from Daryl's ten-to-twenty-year sentence, imposed after a jury had convicted him of second-degree murder, is whether Daryl's formal statement was properly admitted into evidence.

Appellant argues that since his statement was obtained only by ignoring Mrs. Roane's request for counsel, it should have been suppressed. He first emphasizes the case of *In Re Gault*, 387 U.S. 1, 41, 87 S.Ct. 1428, 1451, 18 L.Ed.2d 527 (1967), where, in discussing an accused juvenile's right to counsel, the United States Supreme Court said:

> "We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect to proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, *the child and his parents must be notified* of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child." (Emphasis supplied.)

In *Gault, supra,* the court specifically dealt only with the adjudicatory stage, specifically refusing to deal with the role of a parent or guardian in the pretrial stage of the juvenile process. We hold only that when a parent specifically refuses to consent, the Commonwealth has a heavy burden to meet in establishing that the juvenile's waiver was a knowing and voluntary one.

In so holding, we are following the reasoning of the United States Supreme Court in *Gault, supra,* where it went on to say, in discussing an accused juvenile's pretrial waiver of his privilege against self-incrimination:

> ". . . We appreciate that special problems may arise with respect to waiver of the privilege [against

self-incrimination] by or on behalf of children, and that there may well be some differences in technique —but not in principle—depending upon the age of the child and the presence and competence of the parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel is not present for some permissible reason when an admission is obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it has not been coerced or suggested, but also that it is not the product of ignorance of rights, or of adolescent fantasy, fright or despair." At page 55, 87 S.Ct. at page 1459.

An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had access to the advice of a parent, attorney, or other adult who was primarily interested in his welfare. As the United States Supreme Court said in *Gallegos v. Colorado*, 370 U.S. 49, 54–55, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325 (1962):

"[The juvenile defendant] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights —from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult advice against this inequality, a 14 year old boy would not be able to

know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights."

In *Commonwealth v. Harmon*, 440 Pa. 195, 269 A.2d 744 (1970), we held that a confession taken from a juvenile was properly suppressed upon evidence that his parent's repeated requests to be present during his interrogation were refused. The instant situation is in one way analogous to the facts in *Harmon, supra.*

Here, Mrs. Roane informed the police at the time of Daryl's arrest that she would be following the police car to the station, thereby making it clear that she expected to be present during her son's interrogation. Rather than waiting for Mrs. Roane, the police ignored her. When she got to the station, no one helped her to locate her son. Even after she happened to spot him when he was brought out to a water fountain, the police ignored her presence and returned him to the interrogation room. It was only when he was moved to a second interrogation room, one hour later, and the door of that room was left ajar, that Mrs. Roane was finally able to gain access to the interrogation room.

The Commonwealth seems to contend that the fact that Mrs. Roane was excluded during the early periods of Daryl's interrogation should have no effect on the admissibility of his formal statement because Mrs. Roane finally did gain entrance, was present during a full reading of Daryl's rights, and still was unable to dissuade Daryl from making a full confession. However, in our view, Mrs. Roane's mere presence is not enough. In order to support a finding that Daryl's waiver of his rights was knowing and intelligent, we believe that the record must indicate that Mrs. Roane had an opportunity to give Daryl the kind of helpful advice discussed in *Gallegos, supra.* The instant case reveals no such opportuni-

ty.  Instead, the record makes clear that at no time was Mrs. Roane permitted to talk with her son alone.  Rather, when she did try to talk with Daryl, one officer intruded, asking her to speak up so that she and her son could be heard, and another tried to dissuade her from the advice she was attempting to give by urging her to "let him talk, maybe it will make him feel better."

Since the record indicates that the Commmonwealth first attempted to exclude appellant's mother from the interrogation and then, when she finally gained access, did not afford her an opportunity to advise her son privately about his constitutional rights, although she indicated that she wished him to be afforded the right of counsel, we hold that the Commonwealth failed to establish that appellant's waiver of his rights was a knowing and intelligent one.  Accordingly, his confession should have been suppressed.

Judgment of sentence reversed and case remanded for a new trial.

EAGEN, J., filed a dissenting opinion in which JONES, C. J., and POMEROY, J., join.

NIX, J., concurs in the result.

EAGEN, Justice (dissenting).

I do not condone the tactics of the police in keeping Roane and his mother separated after she arrived at the police station.  By the same token, I cannot join in the ruling of the majority that Roane's willingness to talk with the police without the assistance of counsel was not knowing and intelligent.

It is noteworthy that nowhere in its opinion does the majority say or contend Roane was unaware of his right to the assistance of counsel before telling the police what happened.  In fact the record clearly demonstrates he was very much aware of this right.  How then can it

reasonably be said that his waiver thereof was unknowing?

The thrust of the majority opinion, as I read it, is that a sixteen-year-old, regardless of maturity and experience, may not effectively waive his right to counsel when questioned by the police if a parent is present who is unwilling to join in the waiver. In my view, such a prophylactic rule is unrealistic and overlooks the key to the entire case—that is—what did Roane himself want and was his decision voluntary, and based on a knowing and intelligent understanding of his constitutional rights. At the time Roane was sixteen years of age and mature at least with regard to police procedure, since he had prior contact with the authorities. He was of average intelligence, and in the eleventh grade of high school. He was aware of his constitutional rights and the charges against him. This was not an incommunicado interrogation, since his mother and sister were with him. Moreover, the period of questioning before he first implicated himself was relatively short in duration, and he was not physically abused or threatened.

Hence, we are left with one question: May a sixteen-year-old, under the instant circumstances, refuse the advice of a parent and waive his *Miranda* rights. In the instant case, the mother was given an opportunity to confer with her son and during this time she made her wishes known to him; yet, in the face of this, he indicated to the police he wanted to give a statement. This decision on his part was made with complete knowledge of his constitutional rights, the charges and the wishes of his mother. I know of no ruling of the United States Supreme Court, or of this Court, which denies him the right to make such a decision.

The underlying fear of the line of cases which confront the issue of juvenile waivers has centered around two considerations: First, the will of the juvenile may be overborne by police tactics and he may become a victim

of fear, panic or coercion in the face of the presence of the law and give either an involuntary or untrustworthy statement. Second, because of his tender years he will not be able to understand his constitutional rights or the consequences of waiving these rights; thus, he does not effectively enjoy the benefits of his constitutional rights, or the protections which these rights provide. Under the facts of the instant case, however, both of these considerations are alleviated. Presently, Roane did not stand alone against the authorities because his mother and sister were present; hence, we do not have the fear of an involuntary statement. Moreover, his constitutional rights were explained to him, he was apprised of the wishes of his mother, and, based on his age, maturity, and intelligence he knowingly and understandingly chose to waive those rights. Under like circumstances, we have held such waivers to be valid. See *Commonwealth v. Moses*, 446 Pa. 350, 287 A.2d 131 (1971), and *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970). The fact that his mother was present and indicated she wanted her son to have the aid of an attorney only adds to the *Moses* and *Darden* rulings in the face of the aforementioned considerations. Roane had the benefits of the guidance of his parent, something Moses and Darden did not.

Consequently, I would hold that the waiver of constitutional rights by a sixteen-year-old is valid, even after an adult or guardian expresses the view he or she does not want him to waive his rights, if the sixteen-year-old of his own volition, with a complete knowledge and understanding of his rights, chooses to disregard the advice of the adult. To hold otherwise is to say a sixteen-year-old may never effectively waive his constitutional rights without the consent of his parent or guardian.

JONES, C. J., and POMEROY, J., join in this opinion.