491 A.2d 907

**COMMONWEALTH of Pennsylvania**

v.

**William HINES, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 28, 1984.

Filed April 12, 1985.

458

David S. Shrager, Duquesne, for appellant.

Edward M. Clark, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before JOHNSON, CERCONE and HESTER, JJ.

CERCONE, Judge:

This is an appeal from judgment of sentence for life imprisonment which was imposed following a jury verdict of First Degree Murder on June 22, 1982. Appellant, William Hines was found guilty of the murder of a seventeen year old girl which occurred on April 1, 1970. He had initially pled guilty when he was fifteen years old to the crime; after a degree of guilty hearing, a court *en banc* concluded that appellant was guilty of First Degree Murder on October 2, 1970, and he was sentenced to life imprisonment. Post-verdict motions were denied in May 1972, but no direct appeal was taken.

In 1974, appellant filed a petition under the Post Conviction Hearing Act which alleged that the plea of guilty was not entered intelligently and voluntarily. It was denied after a hearing, and on appeal to the Pennsylvania Supreme Court, the denial of relief was affirmed. The court found

that appellant's claim was waived for failure to allege any extraordinary circumstances which precluded his raising the issue on direct appeal.

Then, in 1979, appellant filed a PCHA petition to withdraw his guilty plea in the court of common pleas. After a hearing and argument, the petition was denied. The Supreme Court reversed and remanded this case for a new trial because there appeared in the colloquy no factual basis for appellant's plea, nor any indication to conclude that appellant understood the nature and elements of the charges against him or the consequences of the plea. *Commonwealth v. Hines*, 496 Pa. 555, 437 A.2d 1180 (1981).

A suppression hearing on appellant's motion was held; the motion was denied. A jury trial was held on June 19, 1982, and appellant was sentenced to life imprisonment. This appeal followed.

Appellant raises a number of suppression issues concerning his statement to police upon apprehension, the search of his home which police conducted, and the use of prior testimony of witnesses who were unavailable at the 1982 retrial. Additionally, he contends that the trial court erred in refusing to charge the jury that they should view the testimony of one witness with caution as that of an accomplice.

Paramount in our consideration of the issue concerning voluntariness of appellant's statement is the fact that appellant was only fifteen years old when he made it. Appellant was arrested on April 5, 1970, at approximately 11:15 p.m. in the home of a friend.[1] At 11:18 p.m. he was told by one

1. As elicited at trial, police investigation led to various witnesses who passed appellant in the vicinity of the crime on the night it happened, late evening April 1, and early morning April 2, 1970. One witness, a motorist, saw the victim, wearing a plaid poncho, walking unaccompanied down the street. (She had left a friend's apartment for another person's apartment around midnight.) This same motorist observed a black male begin to follow the victim, apparently attempting to talk to her. According to the motorist witness, the girl seemed to be trying to avoid him. The man was wearing a three-quarter length dark colored coat and very vivid pink pants. After circling the

of the officers that he was charged with the murder of Eileen Taylor and he was shown the arrest warrant. The officer advised him under the *Miranda* warnings that he had the right to be silent and that anything he said would be used against him; he had the right to an attorney of his choice and if he had no funds the officer would contact the Public Defender's Office and have one appointed for him at no cost. Appellant acknowledged that he understood. The officer related that appellant had seemed scared at first. They placed him in the rear right passenger side of the police car with a police officer next to him and two in the front seat.

On the way to the public safety building, appellant talked with the officer. He told him he was fifteen and that he belonged to a "decathlon" organization. The officer explained that he engaged appellant in conversation primarily to determine his level of understanding, whether he was "street wise" or had "street sense." The officer determined that appellant appeared to understand the questions he posed, that he knew where he was and what he was doing; appellant did not appear to be under the influence of drugs or alcohol.

block out of concern for her safety, the motorist saw them again. However, there did not seem to be any trouble, so he went on his way.

Another witness who lived nearby saw a boy struggling with a girl under the street lamp. The girl wore a plaid poncho, but the witness could not describe the clothing worn by the male. Another person heard a girl screaming for help and pounding on someone's door at about the same time, but she did not call the police. She concluded that the victim had been let inside the house.

Appellant was seen by witnesses wearing a trench coat and pink trousers that night. He was also seen later wearing clothes covered with mud and suspected blood.

On April 4, 1970, police took a search warrant to appellant's home, but according to police, appellant's mother gave her consent to search the house. Police recovered heavily soiled men's underpants and a black trench coat from appellant's bedroom. Appellant's mother also responded to police inquiry that the family patronized two particular dry cleaning establishments. At one of the shops, police recovered a pair of heavily stained pink trousers which had been brought in on the day of the murder. Appellant's last name and home address were on the claim check.

They arrived at the Public Safety Building between 11:30 and 11:45 p.m. Appellant was taken to an interview room, advised of his *Miranda* rights again, and orally interviewed by this same officer until approximately 3:00 a.m. During this interview, appellant admitted to having been with the victim and to wearing the black raincoat and pink pants, but he denied any involvement in the killing. Appellant then requested to speak with a black detective, Warran Walton, whom he had seen on his way in to the Public Safety Building, but whom he did not know. Appellant spoke with detective Walton for about 45 minutes.

Walton was deceased at the time of the suppression hearing; his testimony which was offered at the degree of guilt hearing on September 30, 1970, was admitted into evidence. According to Walton, appellant apparently requested to talk with him because he was also black. Appellant was told by Walton to remain silent if he had anything at all to do with Eileen Taylor's murder. Walton also told him if appellant did not do it and knew who did, that if appellant gave him the information, the parties would be arrested. Appellant told Walton that he didn't do it, but he knew who did.

Walton explained that while "appellant did not seem like the brightest boy in the world, . . . he seemed to know what he wanted to say and what he was saying."

After the talk with Walton, appellant admitted raping the victim, but he furnished the name of James Jefferson as her murderer. Appellant was taken to a cell with a bed so that he could get some sleep, although there is no evidence that he slept. Around 8:00 a.m., the first officer who had interviewed appellant went to get him. He was placed in a room alone with James Jefferson, whom police had arrested pursuant to appellant's statement. After approximately 25 minutes, appellant gave an eleven page question-and-answer type statement to police, who typed it as he spoke. Each page was initialed by appellant after he checked it for errors.

The statement began with appellant's acknowledgement of an understanding of his rights, but also with an expression of willingness to give the statement anyway. Appellant stated that he had gone to eighth grade in school and to being fifteen years of age. Appellant indicated that he understood his rights again and went on to describe how he and Jefferson planned to accost the victim for her purse, how they both raped her, and that Jefferson killed her. At the conclusion of the statement, he answered that he had been treated all right during custody and that he had not been promised anything nor threatened in any way.

After the police had interviewed Jefferson and performed tests on his clothing, blood, and hair, they released him, having concluded that he was not involved at all.

The law pertaining to juvenile confessions has been in flux since appellant's confession in 1970 until the present time.[2] In 1970, *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970) stated the law as a totality of the circumstances rule. *See also Commonwealth v. Moses*, 446 Pa. 350, 287 A.2d 131 (1971) and *In re: Curry*, 284 Pa.Super. 37, 424 A.2d 1380 (1981) (Summary of Pennsylvania case law regarding juvenile confessions). *In Moses, supra*, the court specifically rejected the argument that a juvenile *per se* lacks the ability to assert his rights without the advice of a more mature person.

However, it was the change from a totality of the circumstances test to the *per se* interested adult rule of *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974) from which appellant asserts he should benefit. As the court set forth in *Commonwealth v. McCutchen*, 463 Pa. 90, 343

---

**2.** *Commonwealth v. Williams*, 504 Pa. 511, 521, 475 A.2d 1283, 1288 (1984) is the Pa.Supreme Court's most recent declaration of the law regarding juvenile confessions, and, interestingly, is a return to the totality of the circumstances test. It abrogates the rule of *Commonwealth v. Christmas, infra.*

"All of the attending facts and circumstances must be considered and weighed in determining whether a juvenile's confession was knowingly and freely given. Among those factors are the juvenile's youth, experience, comprehension, and the presence or absence of an interested adult."

A.2d 669 (1975), the confession of a 15 year old defendant, who was not given an opportunity to consult with his mother or interested adult before he waived his rights and made a confession, should have been suppressed. Appellant claims that the interested adult rule should be applied to his confession, thereby rendering it inadmissible since he did not speak to anyone who was interested in his welfare prior to his waiver of *Miranda* rights and at the time of his retrial, *McCutchen* was the law.[3]

*McCutchen* has already been applied to appellants whose direct appeals were pending at the time of the decision and who had properly preserved the issue for appeal. *Commonwealth v. Barnes*, 482 Pa. 555, 557 n.2, 394 A.2d 461 n.2 (1978); *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1976). *See also Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982) (Despite possible applicability of *McCutchen* rule, appellant failed to preserve said claim for review). However, the instant appellant comes before us, not on direct appeal, nor on appeal *nunc pro tunc*, but as a result of a successful PCHA appeal to the Supreme Court which resulted in a new trial. This is the appeal from the new trial. Thus, we must decide whether the interested adult rule of *McCutchen* should be applicable to a post-*McCutchen* retrial.

While the U.S. Supreme Court and Pennsylvania Supreme Court have not ruled on the precise issue of retroactivity presented for our consideration in this case, in *Johnson v.*

**3.** "The [*McCutchen*] rule appreciates that the inexperience of the minor affects not only his or her ability to understand the full implication and consequences of the predicament but also renders the judgment inadequate to assess the spectrum of considerations encompassed in the waiver decision. It was therefore reasoned that the impediment of immaturity can only be overcome where the record establishes that the youth had access to the advice of an attorney, parent or other interested adult and that the consulted adult was informed as to the constitutional rights available to the minor and aware of the consequences that might follow the election to be made." *Commonwealth v. Smith*, 472 Pa. 492, 498–499, 372 A.2d 797, 800 (1977) in *Commonwealth v. Christmas*, 502 Pa. 218, 221, 465 A.2d 989, 991 (1983) (Court abrogates *per se* rule for rebuttable presumption of inadmissibility.)

464

*New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) it held that the *Escobedo* and *Miranda*[4] decisions were to be applied prospectively only. Those cases concerned an adult accused's rights at the time of interrogation. And in *Jenkins v. Delaware,* 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969), the *Miranda* standards were held not to apply to post-*Miranda* retrials of cases. Our own Pennsylvania Supreme Court adopted the reasoning and result of *Johnson* and *Jenkins* in *Commonwealth v. Willman,* 434 Pa. 489, 255 A.2d 534 (1969), in which the appellant argued that because he was not advised of his *Miranda* warnings, his confessions should not have been admitted at his second trial, even though his first trial took place prior to *Miranda* and his retrial took place after *Miranda.* (Willman's new trial was the result of a successful post-conviction motion.)

"... [T]he court has wisely chosen in *Jenkins* to restrict to as great an extent as possible, within the limits of *Johnson,* the anomalous situation where the police are required to have given *Miranda* warnings before *Miranda* had been decided. Since the requirements of *Miranda* do not go to the validity of the guilt-determining process, it seems fair in striking the balance between individual rights and the administration of criminal justice to limit the retroactive application of the case." *Commonwealth v. Willman, supra,* 434 Pa. at 492, 255 A.2d at 535.

Thus, the court held that *Miranda* is not to be applied on retrials of cases where the original trial was held before the decision in *Miranda.*

 We see no reason to refuse to apply this same analysis to the instant case involving whether safeguards additional to *Miranda* which were found to be mandatory in juvenile confession cases from 1975 until 1983 should be applied to a new trial in 1982 involving a statement elicited

4. *Escobedo v. State of Ill.,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

in 1970. To hold appellant's statement *per se* inadmissible because an informed and interested adult was not present at that time would violate the balance that must be struck between individual rights and the administration of criminal justice. In 1970 it was not the practice that an interested adult be present at a juvenile's interrogation; indeed, it did not become mandatory until *Commonwealth v. McCutchen* commanded a majority of the Supreme Court. Moreover, the voluntariness of appellant's statement is reviewable despite the inapplicability of *McCutchen.* Therefore, we hold that the interested adult rule of *McCutchen* is not applicable to post-McCutchen retrials.[5] Appellant's confession will not be rendered inadmissible *per se* for the lack of participation of an interested adult.

■ We must next determine whether, under the totality of the circumstances rule of juvenile confessions, appellant's statement was voluntary. *Commonwealth v. Moses, supra.* All of the attending circumstances must be considered, including the age, maturity and intellect of the individual involved. *Id.*

■ Appellant was fifteen years of age. While there is some confusion about what grade appellant reached in school, he himself stated in his confession that he attended eighth grade. Police testified that he appeared to be aware of what was happening and of what his rights were. He conversed freely with police on the way to the station. He initiated contact with the black police officer who advised

5. The crux of our decision lies in the fact that appellant's claim arises by collateral attack. Thus, although we acknowledge the instant claim as a constitutional one, and as thereby triggering the possible retroactivity of *McCutchen, see Commonwealth v. Geschwendt* (plurality) 500 Pa. 120, 454 A.2d 991 (1982) and Recent decisions, 22 Duquense Law Review 1121 (1984), the fact remains that appellant's case had proceeded to final judgment prior to the change from which he seeks to benefit. For the same reason, our holding is not contrary to *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146 (1983), which held that where an appellate decision overrules prior law and announces a new principle, unless the decision specifically declares the ruling to be prospective only, the new rule is to be applied retroactively to cases where the issue in question is properly preserved at all stages of adjudication up to and including any direct appeal.

him to keep quiet. The total time he was in custody before his statement was taken was approximately nine hours, four of which were spent in a cell in the matron's section of the police station. *Miranda* warnings were administered at least three times to which appellant indicated his understanding. Moreover, he said he had been treated all right during his custody. Our review of the totality of the circumstances convinces us that appellant's statement was indeed voluntary.

■ Appellant alleges that the trial court erred in admitting into evidence at the trial, the testimony of nine unavailable or deceased witnesses from the degree of guilt hearing which was held in 1970. While appellant acknowledges that the requirements for the admission of former testimony is controlled by statute, 42 Pa.C.S.A. § 5917,[6] he contends that the fact that the former proceeding was a degree of guilt hearing necessarily forclosed a need to cross-examine these witnesses. Thus, he argues he was denied the right to confront his accusers. We have examined the trial court's review of each of the nine witnesses' testimony and the degree to which each was cross-examined at the degree of guilt hearing. We agree with the trial court, which, following the standards of *Commonwealth v. Velasquez*, 437 Pa. 262, 263 A.2d 351 (1970), concluded that the testimony of the nine witnesses was not inadmissible hearsay and did not violate appellant's Sixth Amendment rights.[7]

6. Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine if such witness afterwards dies, or is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found, or if he becomes incompetent to testify for any legally sufficient reason properly proven, notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue. For the purpose of contradicting a witness the testimony given by him in another or in a former proceeding may be orally proved.

7. The fact that there were nine such witnesses in this case does not alter our conclusion, but rather is a comment on the fact that twelve years separated the two proceedings.

■ Appellant next argues that the trial court erred in not instructing the jury that the testimony of James Jefferson, one of the witnesses whose testimony was read into the record, should have been considered as coming from a corrupt source as an accomplice. Jefferson testified at the degree of guilt hearing that he had been with appellant until 9:00 p.m. on the night of the murder, but that he had gone home alone at that time. He described appellant as wearing clothes different from those which led to the identification of appellant, that is, the pink pants and black trench coat. Jefferson's testimony was hardly in the nature of an accomplice. Moreover, only appellant's words linked Jefferson to the crime. Police investigation revealed no involvement of Jefferson. The Commonwealth did not indict Jefferson, nor did it proceed on an accomplice theory at trial.

■ Only if the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, is the defendant entitled to an instruction as to the weight to be given that witness's testimony. *Commonwealth v. Thomas*, 479 Pa. 34, 387 A.2d 820 (1978). This is not such a case. Therefore, the court properly omitted the corrupt source section of the accomplice instruction with regard to Jefferson's testimony.

■ Finally, appellant argues that the clothing seized from appellant's bedroom should have been suppressed as seized pursuant to an invalid search warrant. However, we agree with the court below that the search of appellant's home was done with the consent of appellant's mother, despite contradictory testimony by members of appellant's family, including appellant's mother, whose individual testimonies also contradicted each other. The court chose to believe the officers and evidence elicited at the hearing supports the court's findings. We are bound by these factual findings, *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983), and agree with the lower court that consent to search was thereby demonstrated.

468

For all of the above reasons, judgment of sentence is affirmed.